FILED

2010 DEC -1 PM 12:09

U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2010 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SA CR No. CR 10-00243 |
| Plaintiff, | ) | **I N D I C T M E N T** |
| v. | ) | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done] |
| ROSI RAY,<br>   aka "Rose Ray,"<br>   aka "Gloria Lujan," | ) | |
| Defendant. | ) | |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1343, 2(b)]

A.  INTRODUCTION

At all times relevant to this Indictment:

1.  Defendant ROSI RAY, also known as ("aka") "Rose Ray," aka "Gloria Lujan" ("RAY"), resided in Los Angeles and Orange Counties, within the Central District of California.

2.  The Fedwire Funds Service ("Fedwire") was a real-time

gross settlement funds transfer system operated by Federal Reserve Banks that enabled financial institutions to transfer funds electronically. All Fedwire fund transfers were routed through servers in East Rutherford, New Jersey.

B.  **THE SCHEME TO DEFRAUD**

3.  Beginning in or about 2007, and continuing through at least October 2009, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant RAY, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud investors as to material matters, and to obtain money and property from investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

4.  The fraudulent scheme operated, in substance, in the following manner:

   a.  Defendant RAY solicited individuals, and caused others to solicit individuals, to invest with her. The solicitations were made in person and by phone.

   b.  Defendant RAY told existing and potential investors, and caused them to be told, that their investments with her would be used to purchase court-ordered monetary settlement annuities from accident victims at a discount, which settlement annuities would then be cashed in at a substantial profit. In truth and in fact, as defendant RAY then well knew, she did not purchase and did not intend to purchase such settlement annuities at a discount or at all.

   c.  Defendant RAY told potential investors, and caused

them to be told, that their investments with her were guaranteed to earn a substantial monthly return, anywhere from 10 to 200 percent over a period of two to twelve months, depending on the investor. In truth and in fact, as defendant RAY then well knew, the investments were not guaranteed to earn any return.

      d.   Defendant RAY told potential investors, and caused them to be told, that if they invested their money with her, they would receive profit payments derived from the purchase and redemption of settlement annuities. In truth and in fact, none of the investors received any profits from the purchase and redemption of settlement annuities. Rather, the only payments made to investors were drawn from their own investments or were Ponzi payments drawn from the investments of others.

      e.   In addition to using investor funds to make payments to investors and create a false illusion of profitability, defendant RAY also used investor money to pay personal expenses, fund her son's car racing career, and subsidize a ladies handbag consignment business that she owned.

      f.   Beginning during the fall of 2008, in furtherance of the scheme and to lull investors into believing their investments were still safe, defendant RAY told investors, and caused them to be told, in conference calls and by other means, that defendant RAY was unable to pay back returns and principal because, as part of the federal government's "bail out" of American International Group, Inc. ("AIG"), there was a 120-day moratorium on AIG paying out insurance settlements. In truth and in fact, as defendant RAY then well knew, AIG had nothing to do with defendant RAY's difficulties in paying her investors any

3

returns or principal payments.

g. Beginning during the fall of 2008, in furtherance of the scheme and to lull investors into believing their investments were still safe, defendant RAY told investors, and caused them to be told, in conference calls and by other means, that the only risk in their investments with defendant RAY was that they would not get paid on time. In truth and in fact, as defendant RAY then well knew, defendant RAY's investors were at risk not only of not receiving returns and principal on time, but of not receiving them at all.

5. In furtherance of the scheme to defraud, defendant RAY knowingly concealed, and caused others known and unknown to the Grand Jury to conceal, the following material facts, among others:

a. Defendant RAY did not purchase and did not intend to purchase settlement annuities at a discount or at all.

b. Investments with her were not guaranteed to earn any return.

c. The only payments made to investors were drawn from their own investments or the investments of others.

d. Investors were at risk of not receiving any returns on their investment.

e. Defendant RAY was using investor money to fund her son's car racing career, including by making payments to Race Pak Data Systems, a race car data acquisition company; McKinney Corporation, a race car chassis technology and component company; and Racing Schools LLC.

      f.  Defendant RAY was using investor money to pay personal expenses and the expenses of a ladies handbag consignment business that she owned.

    6.  As part of the fraudulent scheme described above, defendant RAY caused approximately 180 investors to invest approximately $10.9 million in defendant RAY's purported monetary settlement annuity business. Approximately half of the investors lost the majority of the money they invested with defendant RAY.

B.  <u>USE OF THE WIRES</u>

    7.  On or about the following dates, within the Central District of California and elsewhere, defendant RAY, for the purpose of executing, and attempting to execute, the above-described scheme to defraud, transmitted, caused the transmission of, and aided and abetted the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DATE | ITEM WIRED |
| --- | --- | --- |
| ONE | 08/27/08 | Electronic transfer through Fedwire of $50,000 from Bank of America in California to Washington Mutual Bank in California to fund victim S.C.'s investment with defendant RAY. |
| TWO | 09/03/08 | Electronic transfer through Fedwire of $50,000 from Bank of America in California to Washington Mutual Bank in California to fund victim S.C.'s investment with defendant RAY. |
| THREE | 09/17/08 | Electronic transfer through Fedwire of $6,000 from Wachovia Bank in California to Washington Mutual Bank in California as a purported profit payment to victim A.D. from defendant RAY. |

| | | |
|---|---|---|
| FOUR | 11/26/08 | Electronic transfer through Fedwire of $75,000 from Wells Fargo Bank in California to Citibank in California to fund victim W.C.'s investment with defendant RAY. |
| FIVE | 08/06/09 | Electronic transfer of $48,827 from Banco Davivienda, S.A. in Colombia, South America, to Bank of America in California to fund victim G.G.'s investment with defendant RAY. |

A TRUE BILL

/S/
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

BEONG-SOO KIM
Assistant United States Attorney
Chief, Major Frauds Section

CONSUELO S. WOODHEAD
Assistant United States Attorney
Deputy Chief, Major Frauds Section

KERRY C. O'NEILL
Assistant United States Attorney
Major Frauds Section